COMMONWEALTH vs. CHARLES E. PRATER.

Bristol. February 9, 1995. - June 15, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Practice, Criminal,* Competency to stand trial, Presumptions and burden of proof, Admissions and confessions, Voluntariness of confession, Capital case. *Due Process of Law,* Competency to stand trial. *Evidence,* Admissions and confessions. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Waiver. Intoxication.*

Evidence at a murder trial at a hearing on the defendant's competency was sufficient to support the judge's ruling that the defendant was competent to stand trial [572-575], and where the judge's ruling made clear that the Commonwealth had the burden of proof on the issue, the proceedings were not defective for alleged want of due process [575-576].

The judge at a murder trial correctly allowed in evidence a videotaped confession of the defendant where the judge found that the defendant had knowingly, intelligently, and voluntarily waived his Miranda rights. [577-579]

Discussion of cases considering whether a confession of a criminal defendant is tainted by a previous violation of his Miranda rights and discussion of the standards of legal analysis applicable to such confessions. [579-581]

At a murder trial in which the judge ruled that the defendant's first confession should be suppressed because, given the defendant's level of intoxication and his low intelligence quotient, the Commonwealth did not establish a valid waiver of his Miranda rights, the judge correctly ruled admissible a second, videotaped confession given about two and one-half hours later, where the judge's findings of fact supported the conclusions that there had been a break in the stream of events sufficient to insulate the second confession from the first confession [581-583] and that the defendant's decision to consent to the videotaped interrogation was not primarily motivated by a feeling that the cat was out of the bag [583-584].

No reason appeared for this court to reduce a verdict of murder in the first degree by extreme atrocity or cruelty to a verdict of a lesser degree of guilt or to order a new trial, either on the facts or from alleged error in the judge's instructions. [585-586]

INDICTMENT found and returned in the Superior Court Department on October 10, 1984.

A hearing on the defendant's competency to stand trial was held before *George Jacobs*, J.; a pretrial motion to suppress evidence was heard by *Robert J. Hallisey*, J., and the case was tried before him.

*Leah R. Kunkel* (*Kim Charles Rosen* with her) for the defendant.

*Mary O'Neil*, Special Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Notwithstanding his defense of lack of criminal responsibility, the defendant was convicted of murder in the first degree by reason of extreme atrocity or cruelty.[1] The defendant appeals on the grounds that (1) the evidence was insufficient to support the trial judge's determination that he was competent to stand trial; (2) a videotaped confession should have been suppressed as the tainted product of an earlier, suppressed confession; and (3) pursuant to our power under G. L. c. 278, § 33E (1992 ed.), we should order a new trial or enter a lesser degree of guilt. We affirm the conviction. We decline to exercise our power under G. L. c. 278, § 33E, in favor of the defendant to order a new trial or enter a verdict of a lesser degree of guilt.

I. *Facts.* We review the facts in a light favorable to the Commonwealth. *Commonwealth* v. *Kappler*, 416 Mass. 574, 575 (1993). Around 6 P.M on September 15, 1984, the defendant went to 520 Cherry Street, Fall River, to visit the victim, Maurice Larue. The defendant had known the victim for some time and previously had lived with his girl friend and the victim in the 520 Cherry Street apartment. During the defendant's visit, the two men drank beer and vodka. At some point the defendant left to purchase more beer. The trial judge found that the defendant consumed four sixteen-ounce cans of beer and eight or nine "shots" of vodka during

---

[1]The judge also submitted this case to the jurors on the theory of deliberate premeditation. The verdict returned by the jurors was based solely on extreme atrocity or cruelty.

his visit. The victim also was drinking quite heavily (his blood alcohol content at the time of death was .33).

The two men had an extended conversation while drinking. At some point the defendant became agitated; an argument ensued, and the two men came to blows. The defendant confessed to punching the victim in the face several times until he fell to the floor. The defendant then searched out and found an axe which he knew the victim kept in a nearby cabinet. According to the defendant, "something just made me kill him. Something went into my head and said, 'kill that guy.' " Once he had the axe, the defendant "just went right towards him and started . . . [c]utting him in half . . . . [The victim] picked his head up and he looked up at [the defendant] [and said,] 'Oh, God,'. . . [and the defendant] just sliced his brain in half."[2]

The defendant did not leave until he was certain the victim had died. The defendant explained that the victim "was making noises, blood gurgling, coughing blood up . . . barfing blood up . . . then he reached the point where he had no blood in him. That was the last mouthful that he barfed up." The defendant told police that he "waited till [the victim] was dead and didn't breathe no more and then all the blood was on the ground and [he] kicked him to see if he was alive. He didn't move."

From 520 Cherry Street the defendant went to a local bar, the Tremont Café. There, Paulie Barboza, a friend of the defendant, helped the defendant wash blood from his jacket and hands. Once his jacket had dried, the defendant proceeded to a second bar, Shaker's. Around 11 P.M. the defendant confided in another friend, Joseph Rutkowski, that he had just killed someone. Doubtful that the defendant had committed a murder, but intending to steal any valuables from the victim's apartment if the defendant had killed him, Rutkowski dared the defendant to show him the body. The

---

[2]The medical examiner's report indicated that the victim suffered at least seven blows to the head with a blunt object and that the injuries to the head and face area were consistent with blows with an axe and punches with a fist.

two men left Shaker's and drove to the victim's apartment in Rutkowski's car. The defendant confessed that he again "[k]icked [the victim] to see if he was alive." When the defendant showed Rutkowski the body, Rutkowski said "they should hire you for some Union." But when he saw the defendant pick up the axe, "Ru[t]kowski got scared. He ran out into the hallway, thought [the defendant] was going to do him up for robbing [the victim]." The defendant ran after Rutkowski, dropping the axe on the stairway in his rush to catch up with him. Catching Rutkowski before he drove away, the defendant said, "Joe, let's go and have a few drinks, you know, hang around . . . . No problem. Let's go . . . I'll pay for it."

Rutkowski drove the defendant back to Shaker's, where he called the police from a public telephone. In the interim, the defendant argued with another bar patron, whom he threatened to kill just as he had killed the victim. When the police arrived at Shaker's, the defendant and Rutkowski accompanied them to Cherry Street. The defendant then was arrested, initially for assault and battery by means of a dangerous weapon, and brought to the police station. After being read the Miranda warnings he signed a waiver form. In his statement, the defendant confessed to the crime. After the first confession, the defendant consented to a second round of interrogation while being videotaped. The trial judge suppressed the first confession but allowed the second. The facts surrounding the two confessions given by the defendant at the station are provided in more detail in the analysis of their admissibility. See *infra*. The defendant did not challenge the facts of the murder. His trial strategy was based on his claim that he was not criminally responsible.

II. *Competency to stand trial.* The defendant entered a plea of not guilty and requested a hearing on competency. Pursuant to G. L. c. 123, § 15 (*b*) (1992 ed.), the defendant was examined at Bridgewater State Hospital by the assistant medical director, who reported to the motion judge that the defendant was competent to stand trial. The motion judge held a three-day hearing and received testimony from five

mental health experts as to the defendant's competence. See *Pate* v. *Robinson*, 383 U.S. 375, 385 (1965) (criminal defendant's due process right to fair trial requires hearing on issue of competence to stand trial); *Commonwealth* v. *Hill*, 375 Mass. 50 (1978). After the hearing, the motion judge concluded that the defendant was competent to stand trial. The defendant argues that the evidence was insufficient to support the motion judge's conclusion that the defendant was competent to stand trial. He further challenges the motion judge's finding on the ground that the hearing on competence did not satisfy the due process clause. We do not agree.

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope* v. *Missouri*, 420 U.S. 162, 171 (1975). See *Commonwealth* v. *Crowley*, 393 Mass. 393, 398 (1984) (criminal defendant may not stand trial if unable to understand charges against him, communicate with counsel, and aid in his own defense). In *Commonwealth* v. *Vailes*, 360 Mass. 522 (1971), we followed the standard of competency to stand trial set forth by the United States Supreme Court in *Dusky* v. *United States*, 362 U.S. 402 (1960) (per curiam). See also *Drope* v. *Missouri, supra*; *Godinez* v. *Moran*, 509 U.S. 389, 396-402 (1993). For a criminal defendant to be competent to stand trial, the judge hearing the competency issue must find that the Commonwealth has shown by a preponderance of evidence,[3] *Commonwealth* v. *Crowley*,

---

[3]At the hearing, the parties and the motion judge proceeded as if the burden of proof rested with the defendant. However, prior to making his findings and issuing his order, the judge properly determined that the burden of proof rested with the Commonwealth. As the judge noted in his order, the misapprehension at the hearing did not effect the fairness of the hearing to the defendant, because the practical effect of it was to allow the defendant to present more evidence tending to show incompetence than the Commonwealth presented tending to show competence. Nevertheless, when evaluating the evidence under the proper standard, the motion judge still credited the Commonwealth's evidence. Because the confusion was cleared by the motion judge prior to making findings and issuing his order, there

*supra* at 401-402, that "[(1)] [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and . . . [(2)] [the defendant] has a rational as well as factual understanding of the proceedings against him." *Commonwealth* v. *Vailes, supra* at 524, quoting *Dusky* v. *United States, supra* at 402.

In reviewing the motion judge's determination that the defendant was competent to stand trial, we give substantial deference to his findings of fact because the judge had the opportunity to view the witnesses in open court and to evaluate the defendant personally. *Commonwealth* v. *DeMinico*, 408 Mass. 230, 235-236 (1990). The motion judge had a duty to weigh the credibility of the expert testimony in determining whether the Commonwealth had met its burden of proof to show the defendant had a "present ability to consult with his lawyer with a reasonable degree of rational understanding" and also to determine whether the Commonwealth had shown that the defendant had "a rational as well as factual understanding of the proceedings against him." *Commonwealth* v. *Vailes, supra.*

The experts generally agreed that the defendant had a low intelligence quotient (IQ) indicative of borderline retardation and that he was on medication usually prescribed for mental illnesses,[4] but offered conflicting conclusions as to the defendant's competency to stand trial. Weighing the conflicting conclusions of the experts, the judge credited testimony of Dr. Luber that, although the defendant had a low IQ and had suffered from psychiatric problems in the past, he could communicate with his lawyer and participate in his defense and also had a rational and factual grasp of the proceedings

was no fundamental unfairness created by the misapprehension at the hearing.

[4]Although use of prescription medication for psychiatric disorders is a factor carefully to be considered in determining competency to stand trial, there was testimony from one expert that because the issue is whether the defendant is presently competent to stand trial, one cannot properly reason backward from the fact of use of prescription drugs to whether the defendant is now competent. The trial judge credited expert testimony based on current evaluations of the defendant.

against him. The motion judge was not obliged to accept the testimony of other experts who opined that, due to his low IQ and various diagnoses of psychiatric disorders, the defendant was not competent. See *Commonwealth* v. *DeMinico, supra* at 235-236 ("Judicial experience with psychiatric testimony makes it abundantly clear that it would be unrealistic to treat an opinion . . . by an expert on either side of . . . [an] issue as conclusive"), quoting *Commonwealth* v. *Lamb*, 372 Mass. 17, 24 (1977). See also *Commonwealth* v. *Kappler, supra* at 579 (acceptance of "uncontroverted testimony of experts" not required); *Commonwealth* v. *Shelley*, 381 Mass. 340, 347 (1980) (finder of fact "not obliged to believe the testimony of any of the expert witnesses" in determining defendant's criminal responsibility). It is not the number of experts, but the credibility of their testimony which the judge must weigh.

The defendant relies heavily on *Commonwealth* v. *Crowley, supra*, where we reversed a ruling that the defendant was competent to stand trial on the ground that the very minimal evidence of competence was insufficient to satisfy the Commonwealth's burden of proof by a preponderance of evidence and where it was "not clear from the record . . . whether the judge placed the burden of proving competency on the prosecution, as is appropriate." *Id.* at 400. By contrast, the evidence was sufficient to support the motion judge's ruling. Furthermore, although there was confusion at the time of the hearing as to the burden of proof, the written ruling following the hearing made clear that the burden of proof was on the Commonwealth and the judge applied that burden in ruling on the defendant's competency.[5] The pro-

---

[5]The motion judge acknowledged the confusion in his written ruling after the hearing, but stated that "the defendant was not prejudiced by the apparently shared misconception concerning burden of proof during the hearing in view of the fact that he not only offered the testimony of the psychologist and the two psychiatrists that he had been authorized to engage, but also offered the testimony of an additional witness, a lawyer-psychologist. Furthermore, the only witness offered by the Commonwealth was the psychologist who had authored the required report under

ceedings afforded the defendant in reaching that conclusion were not constitutionally defective.

III. *Motion to suppress videotaped confessions.* In reviewing the trial judge's rulings on the defendant's motion to suppress, "[w]e accept, as we must, the trial judge's resolution of conflicting testimony . . . and will not disturb his subsidiary findings if they are warranted by the evidence . . . . However, ultimate findings and conclusions of law, particularly those of constitutional dimensions, are open for our independent review in this appeal." (Citations omitted.) *Commonwealth* v. *Mahnke,* 368 Mass. 662, 666-667 (1975), cert. denied, 425 U.S. 959 (1976).

The defendant gave two confessions to the police after his arrest. The first was not recorded at the time it was given, but the second was videotaped. Prior to the first confession, which began around 2:50 A.M., the police read the defendant the Miranda warnings and he signed the waiver form. The trial judge found that the defendant's name was printed by him on the first waiver form and the defendant misspelled his name. The trial judge also credited testimony from the interviewing officers that the defendant "smelled of alcohol, appeared glassy-eyed, but was able to walk normally and talk without slurring." Based on the conclusion that the defendant was very intoxicated, the judge ruled that the waiver was not knowing, intelligent, and voluntary and accordingly granted the defendant's motion to suppress the first confession.

However, the judge denied the defendant's motion to suppress the second, videotaped confession. After answering police questions and making incriminating statements, the defendant was asked if he would repeat his statement (confession) on videotape. He agreed. He did not request a lawyer. It took police approximately one and one-half hours to retrieve and assemble the necessary audiovisual equipment. In the interim, the defendant was allowed to use the

---

§ 15 (*b*) . . . . He therefore could not have been prejudiced when that witness, and only that witness, testified for the Commonwealth."

telephone. The defendant's mother also arrived at the station. Seeing his mother, the defendant made incriminating statements to the effect that, "That was you I killed." The police immediately separated the defendant and his mother.

The videotaping began at 5:27 A.M. and continued for approximately twenty minutes. The Miranda warnings were repeated and the police asked the defendant if he understood the warnings. The defendant indicated he understood them and signed a second waiver form while being videotaped. Before signing the waiver form, the defendant told the police: "I don't know how to read. I'll be honest with [you]." The police then read the defendant the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966). The police indicated where the defendant should sign the waiver form. The trial judge determined that the second form was signed and the defendant spelled his name properly, and because the effects of the alcohol had worn off, this second waiver was knowing, intelligent, and voluntary.[6]

The defendant argues on appeal that the videotaped second confession should have been suppressed for two reasons. First, the defendant argues that he did not knowingly, intelligently, and voluntarily waive the Miranda warnings. Second, the defendant argues that the second confession was tainted by the first confession, which the trial judge suppressed as involuntary. The defendant maintains that the first and second confessions were obtained in such rapid succession that there was no "break in the stream of events" and thus, the circumstances which rendered the first confession involuntary equally influenced the second confession. Furthermore, contrary to the trial judge's specific findings of fact as to the

---

[6]Pursuant to G. L. c. 278, § 33E, the defendant asserts that he was not permitted to see or speak with his child care counsellor. At trial, the counsellor (a witness limited to the defendant's mental capacity) so stated. At the motion hearing and at trial, the police said that the defendant spoke with the counsellor by telephone, and that after that conversation, the counsellor spoke with an officer and told the officer to get in touch with the defendant's mother. The police did so. To the extent that there was a conflict in trial testimony, resolution of the conflict was for the finder of fact.

defendant's motivations for giving the second confession, the defendant asserts that the first confession "let the cat out of the bag," and that his awareness that he had incriminated himself in the first confession was the motivating factor in giving the second confession. Under a line of decisions from *Commonwealth* v. *Mahnke, supra,* through *Commonwealth* v. *Osachuk,* 418 Mass. 229 (1994), which addresses the admissibility of confessions given subsequent to inadmissible incriminating statements, the defendant maintains that the second confession could not have been voluntary — given his low IQ and intoxication, and his knowledge that he had already let the cat out of the bag — and thus should not have been admitted at trial.

A. *Knowing, intelligent, and voluntary waiver.* The Commonwealth had the burden of proof beyond a reasonable doubt that the defendant knowingly and intelligently waived the constitutional rights protected by *Miranda. Commonwealth* v. *Day,* 387 Mass. 915, 921 (1983). The trial judge found that the defendant had been properly warned and that the defendant made a valid waiver before the videotaped confession. We reject the defendant's suggestion that we should replace the trial judge's supported findings with our own findings that he was not intelligent enough and also was too intoxicated to comprehend his rights and waive them at the start of the 5:27 A.M. videotaped confession. Findings of fact are for the trial court, not an appellate court.[7]

"Illiteracy and low intelligence are factors in examining the totality of the circumstances leading to a waiver" (citations omitted). *Commonwealth* v. *Taylor,* 398 Mass. 725, 728 (1986). See *Commonwealth* v. *Medeiros,* 395 Mass. 336, 347 (1985) ("A mentally deficient adult may make an effective waiver of his rights and render a voluntary, knowing, and admissible confession"), quoting *Commonwealth* v.

---

[7]In his brief, the defendant accepts as fact the opinions set forth by his experts. While we are in the same position as the trial judge in viewing the videotape, the question whether to credit oral testimony by experts was first for the trial judge, and then for the jurors. The credibility of witnesses is not for the appellate court.

*Cameron,* 385 Mass. 660, 665 (1982). "Intoxication also bears on the validity of a waiver and the voluntariness of a statement" (citations omitted). *Commonwealth* v. *Taylor, supra.* The trial judge carefully considered both the defendant's intelligence and his level of intoxication in determining that the defendant was capable of understanding the Miranda warnings, especially because this was not the first time he had been subject to a custodial interrogation pursuant to Miranda, see, e.g., *Commonwealth* v. *Davis,* 380 Mass. 1, 4-6 (1980), and that by 5:27 A.M. the defendant was not overcome by intoxication, see, e.g., *Commonwealth* v. *Doucette,* 391 Mass. 443, 448 (1984). The trial judge heard testimony from the arresting and interrogating officers and viewed the videotape. Having viewed the videotape and reviewed the record, we conclude that the judge's decision to credit the defendant's videotaped assertion that by the time of the videotaping the effects of the alcohol had worn off was warranted by the videotape itself.[8] We now turn to whether the second confession was tainted by the first confession.

B. *Effect of first confession on admissibility of videotaped second confession.* As we recently explained in *Commonwealth* v. *Smith,* 412 Mass. 823, 829 (1992), "[u]nder Federal constitutional law prior to the decision of the United States Supreme Court in *Oregon* v. *Elstad,* 470 U.S. 298 (1985) . . . an admission or confession of guilt obtained from an accused person in violation of the Miranda requirements was presumed to taint any subsequent confession made by the accused, and the taint could not be dissipated solely by giving Miranda warnings. *Commonwealth* v. *Haas,* 373 Mass. 545, 554 (1977) [, *S.C.,* 398 Mass. 806 (1986)]." In *Oregon* v. *Elstad, supra* at 300, the United States Supreme Court reconsidered "whether an initial failure of law enforcement officers to administer the warnings required by *Miranda* v. *Arizona,* 384 U.S. 436 (1966), without more, 'taints' subsequent admissions made after a suspect has been

---

[8]During the videotaped confession, the defendant spontaneously stated that the effects of the alcohol had worn off.

fully advised of and has waived his *Miranda* rights," and ultimately rejected the rule of a presumptive taint.[9]

We have declined to follow the Supreme Court's decision in *Oregon* v. *Elstad, supra,* to reject the rule of presumptive taint. *Commonwealth* v. *Smith, supra* at 836. Instead, we "presume that a statement made following the violation of a suspect's Miranda rights is tainted, and . . . require the prosecution [to] show more than the belated administration of Miranda warnings in order to dispel that taint." *Id.* "This presumption may be overcome by showing that either: (1) after the illegally obtained statement, there was a break in the stream of events that sufficiently insulated the post-Miranda statement from the tainted one; or (2) the illegally obtained statement did not incriminate the defendant, or, as it is more colloquially put, the cat was not out of the bag." *Commonwealth* v. *Osachuk, supra* at 235. See *Commonwealth* v. *Haas, supra.* The parties dispute whether a court is required to undertake both lines of analysis (i.e., both break-in-the-stream-of-events and cat-out-of-the-bag analyses) in determining the admissibility of confessions given subsequent to statements taken in violation of the Miranda requirements.[10]

---

[9]In that case, the Supreme Court stated: "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Oregon* v. *Elstad,* 470 U.S. 298, 314 (1985).

[10]We addressed this dispute in *Commonwealth* v. *Smith,* 412 Mass. 823 (1992), explaining that the two lines of analysis are intended to aid courts in determining whether the later statements were voluntary. *Id.* at 830. Depending on the facts of the case, either or both of these lines of analysis may be applicable. For example, we noted that in *Commonwealth* v. *Haas,* 373 Mass. 545 (1977), *S.C.,* 398 Mass. 86 (1986), the first statements were inculpatory and were obtained in violation of the Miranda requirements and therefore applied both lines of analysis in determining that the subsequent statements should have been suppressed. However, we also noted that in *Commonwealth* v. *Watkins,* 375 Mass. 472 (1978), because

The focus and ultimate goal of undertaking either or both lines of analysis is a determination of the voluntariness of the later confession. If the defendant's subsequent statements were not a product of coercion, either by coercive external forces or primarily by a sense of futility that he has already incriminated himself with the first statement, then the Fifth Amendment to the United States Constitution does not require suppression of the subsequent statement.

It was clear that the defendant's first statement to police was inculpatory. The trial judge ruled that the first confession was obtained in violation of the Miranda requirements, because given the defendant's level of intoxication and his low IQ, the Commonwealth could not establish beyond a reasonable doubt that the defendant had knowingly, intelligently, and voluntarily waived the Miranda warnings. However, the trial judge allowed the videotaped second confession, ruling that it was not tainted by the first confession. Although the trial judge did not break his analysis of the videotaped second confession down into separate discussions of (1) whether there was a "break in the stream of events," and (2) whether the defendant was motivated to confess on videotape by the fact that the "cat was out of the

the first statements made to police were evoked by illegal police interrogation but were not inculpatory, the break-in-stream-of-events line of analysis but not the cat-out-of-the-bag analysis was applicable. *Commonwealth* v. *Smith, supra* at 831. Finally, we rejected the Commonwealth's argument in *Commonwealth* v. *Smith, supra* at 833 n.9, that where the first statement, although obtained in violation of the Miranda requirements, is not inculpatory, there is no need for a court to undertake a break-in-the stream-of-events analysis before admitting subsequent statements. "In circumstances where a suspect is subjected to a continuous custodial interrogation (i.e., there is no break in stream of events) but does not respond with an incriminating statement until after the Miranda warnings have been given (i.e., the cat is not out of the bag), it may be argued that no Fifth Amendment violation has occurred. . . . However, because interrogation without benefit of the Miranda warnings is itself improper police conduct, the absence of a break in the stream of events, in some circumstances, may mandate the suppression of a post-Miranda statement, even where the suspect made no incriminating statement during the course of the illegal interrogation." *Id.* Thus, whether one or both lines of analysis is required before a confession is admitted turns on the facts of the case.

bag," his written order properly addresses both prongs of the analysis.

First, with respect to whether there was a "break in the stream of events," the trial judge properly considered external factors, see *Commonwealth* v. *Smith, supra* at 830 (focus of break-in-stream-of-events analysis "is on external constraints, continuing or new, which may have overborne the defendant's will"), the "temporal proximity" of the second confession to the first, illegally obtained confession, see *Commonwealth* v. *Haas, supra* at 554, and the "presence of intervening circumstances," between the two confessions, see *id.* Based on these considerations the trial judge determined that: (1) by the time the defendant received Miranda warnings for the videotaped confession sufficient time had elapsed for the effects of alcohol to have worn off; and (2) ninety minutes passed between termination of the first confession and the commencement of the videotaped confession. The trial judge further noted that on the videotape the "[d]efendant appears . . . to be calm, making eye contact with the police, joking . . . ."[11] These findings of fact support a conclusion that there was a break in the stream of events sufficient to insulate the second confession from the circumstances of the first confession. We note that because the trial judge indicated in his order that the defendant's intoxication was the primary reason the judge was not convinced beyond a reasonable doubt that the first confession was voluntary, the trial judge's findings with regard to the passage of time and the defendant's appearance of sobriety on the videotape support his implicit conclusion that there

---

[11]The trial judge noted the defendant's attempt at humor by allusion to the case of Commonwealth *vs.* Lizzie Borden, with the statement: "I hit him. Then the guy went to get up, come at me. I hit him again, then that finally did it, che [*sic*]. I hit him with an axe, gave him [forty] whacks, ha ha." The fact that the defendant's expert viewed these remarks as supporting the defendant's claim of incompetence and involuntariness does not require the trial judge, the jurors, or this court to accept the expert's explanation.

was a break in the stream of events between the first and second confessions.

Second, the trial judge made several findings of fact with respect to the conclusion that the videotaped confession "was not a case of the defendant concluding that the 'cat was out of the bag' and he had 'nothing more to lose' (even though defendant used those phrases)." The trial judge found that, by the time of the second confession, being sober, (1) the defendant began to realize "[t]he enormity of what he had done" and (2) "felt the pangs of a guilty conscience. [(3)] He hoped for favorable treatment by the police. [(4)] He was feeling the pressure to seek expiation by confession." Accordingly, the trial judge concluded that the defendant's decision to consent to the videotaped interrogation "was not primarily motivated by a feeling that the cat was out of the bag."

At issue is the defendant's state of mind at the time of the 5:27 A.M. videotaped confession. The defendant has a low IQ; he had consumed a significant amount of alcohol during the previous evening; and, in response to the question posed by police at the commencement of the second videotaped confession — "Have you been promised anything for videotaping this or anything like that? Are you under any duress or are we forcing you, or are you doing this of your own free will?" — the defendant stated, "Seeing as I got nothing else to lose, I'll do this, too."

In addition to emphasizing his low intelligence and intoxication, the defendant maintains that his above-quoted statement that he had "nothing to lose," weighs heavily against the trial judge's conclusion that the second confession was not a case of the cat's being out of the bag. It is true that in giving meaning to the metaphor "cat out of the bag," courts have explained that "[a] principal reason why a suspect might make a second or third confession is simply that, having already confessed once or twice, he might think he has *little to lose* by repetition. . . . It would be neither conducive to good police work, nor fair to a suspect, to allow the erroneous impression that he *has nothing to lose* to play the

major role in a defendant's decision to speak a second or third time." (Emphasis added.) *Darwin* v. *Connecticut*, 391 U.S. 346, 350-351 (1968) (Harlan, J., concurring in part and dissenting in part); *Commonwealth* v. *Mahnke, supra* at 686 (quoting *Darwin, supra*). While we recognize the concern of the cat-out-of-the-bag analysis, we conclude that the one statement by the defendant does not automatically compel exclusion of the videotape. See *Commonwealth* v. *White*, 353 Mass. 409, 417 (1967) ("If the relation between the earlier and later confession is not so close that one must say the facts of one control the character of the other, the inference is one for the triers of fact and their conclusion, in such an uncertain situation, that the confession should be admitted as voluntary, cannot be a denial of due process"), quoting *Lyons* v. *Oklahoma*, 322 U.S. 596, 603 (1944).

In *Commonwealth* v. *Mahnke, supra* at 687, we noted that the defendant, in making a second confession, thought that "he had 'little to lose' . . . through further admissions, but not because he feared the use of his previous statements. He may have thought he had 'little to lose' based on an actual belief that he could not be convicted." Further, we noted, *id.* at 688, that the further admissions might have been due to "relief at having divulged his secret at last. Neither of these sentiments is the sentiment against which the cat-out-of-the-bag analysis would guard. Fear, continuation of coercive effects, and a sense of futility of attempting to 'get the cat back in the bag' are the objects of the analysis." The trial judge in this case considered specifically whether the primary motivation of the defendant was that he had already incriminated himself and found to the contrary. "In these circumstances, we cannot say, contrary to the judge's findings, that the [videotaped confession was] involuntary because [it was a] product[ ] of earlier statements." *Id.* The videotape, which is before us, supports the judge's determination that the statement was voluntary. Further, much of what the defendant told the police, he also told Paulie Barboza and Joseph Rutkowski.

IV. *Relief under G. L. c. 278, § 33E*. The defendant argues that justice requires that we order a new trial or direct the entry of a verdict of a lesser degree of guilt.[12] The defendant emphasizes that he was nineteen years old at the time of the murder; he was abused by his parents as a child; he has a lifelong history of psychological imbalance; and he has an IQ of about seventy. We acknowledge the defendant's difficult circumstances, but do not think his background can overcome the evidence against him at trial, which strongly supported the jury verdict that the defendant killed Larue with extreme atrocity or cruelty by bludgeoning his head and face with an axe. Even if the admissibility of the videotaped second confession turned on a close question of fact as to the defendant's state of mind, the defendant made an overwhelming number of incriminating statements which were admitted in evidence and correctly are not challenged on appeal. We note that on the evening prior to the murder, the defendant told a close friend that he was going to murder someone. After the murder, Paulie Barboza helped him wash blood from his jacket and hands. The defendant brought Rutkowski to the murder scene after boasting that he had killed someone. After showing Rutkowski the murder scene and returning to Shaker's bar, the defendant threatened a patron with whom he argued that he would "chop off his head" just as he had the victim's. Finally, the defendant yelled at his mother, in front of police, "That was you I killed."

The defendant argues that the judge failed specifically to instruct the jurors that they must conclude that the videotaped statement was the product of a rational mind. We consider "the charge in its entirety since the adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980). The question whether "the confession was the product of a rational intellect [is] part of the issue of

---

[12]The defendant did not challenge the facts of the murder at trial. His strategy was directed at a defense of lack of criminal responsibility.

voluntariness." *Commonwealth* v. *Johnston*, 373 Mass. 21, 25 (1977). The judge correctly submitted the issue of voluntariness, including rational intellect, to the jurors. The defendant's complaint that the judge only instructed once on the issue of rational intellect and that he did not emphasize its significance is without merit. The instructions on voluntariness were correct. There is no substantial likelihood of a miscarriage of justice.

We have considered the entire case on the law and the evidence, see G. L. c. 278, § 33E, and conclude that the interests of justice do not require a new trial or entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*