Hely, Charles J., J.
A. Introduction
The amended indictment charges the defendant with trafficking in oxycodone, 100 grams or more, in violation of G.L.c. 94C. §32E(c)(3).
MBTA Transit Police officers found over one thousand oxycodone pills near the defendant in a bus. The bus had just arrived at Boston’s South Station from New York City. The officers found the drugs during a drug interdiction procedure in which all of the passengers arriving on the bus were detained as a group on the bus for about five minutes while a drug-detecting dog sniffed the luggage that had been in the stored suitcase compartment of the bus.
Under Supreme Judicial Court decisions interpreting Article 14 of the Massachusetts Constitution, the detaining of the defendant was unlawful because the officers did not have a reasonable basis to suspect criminal activity by the defendant prior to detaining him on the bus. The defendant discarded the drugs in the bus’s bathroom as the direct and immediate response to his being detaining. The defendant’s motion to suppress the drugs must be allowed.
*661 The findings are based on the evidence and the reasonable inferences that the court has drawn from the evidence. The court finds that the testimony of Lieutenant Detective Richard Sullivan and Detective Matthew Haney of the MBTA Transit Police was reliable and convincing on the material points. Their testimony is adopted as part of the court’s findings.
B. Facts
On July 14, 2014, at about 1:00 p.m., four Transit Police officers performed a drug interdiction on a bus arriving at the Boston South Station bus terminal. The bus was a Lucky Star bus arriving on a direct trip from New York City.
New York is a source ciiy for trafficking in illegal narcotics destined for Boston. Trafficking amounts of addictive drugs are often brought to Boston by runners traveling on direct busses from New York to South Station. The police frequently seize heroin, cocaine, oxycodone and other opioid drugs from persons arriving at the South Station bus terminal on direct trips from New York. Drug traffickers use commercial buses in part because the courier can board a New York to Boston bus by paying cash a few minutes before departure and without providing any identifying information. The anonymity reduces the risk of the courier being caught and identified.
The MBTA Transit Police has developed a standard procedure that it uses in drug interdictions for direct bus trips from New York City to South Station. Five or six companies, including Greyhound, operate direct buses from New York. Direct New York-to-Boston buses arrive at South Station many times per day. The Transit Police perform drug interdictions on the arriving buses several times per week when they have sufficient officers available. They perform the interdic-tions on direct New York-to-Boston bus trips operated by all of the bus companies that provide this service. The bus drivers are familiar with the procedure. The drivers cooperate with the police when an interdiction is performed.
The drug interdiction in this case did not vary in any substantial way from the standard procedure. At about 1:00 p.m. on July 14, 2014, a Lucky Star bus arrived at South Station, Bus Dock 23, on a direct trip from New York. Four officers in plain clothes were present at the unloading area. Lieutenant Detective Sullivan signaled to the driver, and the driver opened the door for him. Lieutenant Detective Sullivan stepped aboard and stood at the yellow line next to the driver’s seat. The yellow line marks the driver’s area where passengers are not permitted during the trip. The other three officers waited outside the bus.
All of the officers carried their standard firearms in holsters covered by their clothing. No officer displayed a firearm during the entire incident.
The bus had seats for fifty-two passengers. There were about fifty passengers aboard on this trip.
When he stepped aboard, Lieutenant Detective Sullivan held up his badge and identified himself. A few of the passengers were already standing. Lieutenant, Detective Sullivan spoke to the passengers as a group. He used a calm, non-threatening tone, speaking loudly enough for all passengers to hear. He stated that the bus “has been chosen for a narcotics check.” He said that officers would remove the stored luggage from the suitcase storage compartment and that they would place the luggage on the walkway near the bus. The suitcase storage compartment is in a lower section of the bus that is separate from the passenger seating area. The suitcase storage compartment is normally accessed by the bus driver from outside the bus when it is time for the stored luggage to be unloaded.
Lieutenant Detective Sullivan told the passengers that a police dog would do “an open-air sniff on the outside of your bags” on the walkway. He told the passengers that the procedure would take about five minutes and that after that they could go on their way. He instructed the passengers to remain on the bus until the procedure was complete. He said that the officers appreciated their cooperation with this procedure. His announcement took a minute or less.
Normally when a bus driver unloads the stored luggage, the unloading takes up to twelve minutes. When two officers unload the luggage in a drug interdiction, the unloading and the dog’s preliminary walk-around takes less time than a normal luggage unloading. After the drug dog sniff if there is nothing suspicious about a passenger or her luggage, the passenger is permitted to get off the bus, take her luggage and leave. The entire procedure normally takes about five minutes.
An important part of the drug interdiction procedure is the officers’ observations of the behavior of the passengers beginning when the first officer boards the bus and announces the procedure. In this case, when Lieutenant Detective Sullivan was announcing the narcotic check to the passengers he saw a look of panic on the defendant. The defendant was standing in the third row from the rear of the bus.
Two officers began unloading the stored luggage while Lieutenant Detective Sullivan made his announcement to the passengers. Lieutenant Detective Sullivan stepped off the bus. He walked about sixty percent of the way to the rear of the bus. He continued to watch the defendant through the bus windows.
Detective Haney was already watching the defendant through the windows from outside. He thought that the defendant’s movements in the back of the bus looked suspicious. The defendant appeared to be making a call on his cell phone and doing some fast texting on the phone. The defendant was also looking left to right out of the windows on both sides of the bus.
Detective Haney saw the defendant take his backpack and go into the bathroom at the rear of the bus. *662 Lieutenant Detective Sullivan saw the defendant rush into the bathroom.
The bathroom window had the same size and alignment as the other passenger windows. When the defendant was in the bathroom, the bathroom window curtains were not closed all the way. There was an opening of about an inch between the curtains. The curtains were not completely opaque. Detective Haney could see the defendant making “wild movements” inside the bathroom. Detective Haney saw these movements by looking in the opening between the curtains and by seeing the defendant’s moving silhouette through the curtains.
The defendant stayed in the bathroom for about thirty seconds. The defendant then came out and went to the last seat row on the bus. The defendant had been standing a few seats farther forward when the officers first started watching him. Detective Haney saw the defendant holding his phone low. He appeared to be texting and reading the screen. The defendant looked out the windows again.
The defendant picked up his backpack and went into the bathroom a second time. Detective Haney changed his position and again watched the defendant while he was in the bathroom. He saw “a lot of movement” by the defendant in the bathroom. The defendant was moving his hands up on the wall above the toilet bowl. Detective Haney thought that the defendant’s movements in the bathroom were abnormal for a passenger who is about to be leaving the bus at the end of his journey. Detective Haney told Lieutenant Detective Sullivan what he had seen. Lieutenant Detective Sullivan had also seen much of the defendant’s movements in the bathroom.
While Lieutenant Detective Sullivan and Detective Haney were watching the defendant, the other two officers finished unloading the stored luggage. An officer had the narcotics detecting dog walk around the luggage. That took one to two minutes. The dog gave no narcotic alert on the stored luggage. Lieutenant Detective Sullivan told the driver that the passengers could leave. The passengers filed off the bus. They began picking up their stored luggage and departing. Lieutenant Detective Sullivan stood next to the open door at the front of the bus. He welcomed the passengers to Boston and thanked them for their cooperation. Some of the passengers thanked him. Some asked him for tourist tips.
Approximately five minutes had passed between when Lieutenant Detective Sullivan boarded the bus and announced the narcotic check and when the passengers, other than the defendant, left the bus and departed with their luggage.
The defendant was among the last few passengers to get off the bus. He was carrying his backpack when he stepped off. The defendant did not have any stored luggage. As he stepped off the bus, the defendant looked down. He appeared to be trying to avoid Lieutenant Detective Sullivan who was standing next to the door. The officer said, “Excuse me sir. Can I talk with you?” The defendant replied, “Sure. What’s up?” The officer told him that they were checking for narcotics and that he had observed some behavior by the defendant that concerned him.
The defendant became very nervous. He denied any drug involvement. Lieutenant Detective Sullivan asked the defendant questions about where he had stayed and what had he been doing in New York. The defendant gave vague answers. In response to questions, the defendant said that he had gone from Boston, stayed in the Bronx and returned to Boston in less than twenty-four hours. The brevity of the trip added to the officer’s suspicion. The defendant would not look at the officer. He kept looking down.
Lieutenant Detective Sullivan asked the defendant if he would mind if they did a dog sniff of his backpack. He asked this in a conversational tone. The defendant handed him his bag and said, “Go ahead.” The officer promptly had the dog walk by the defendant’s backpack. He told the defendant to watch the dog sniff. The dog signaled a narcotic alert on its second walk around the backpack.
Lieutenant Detective Sullivan told the defendant that the dog had given a narcotic alert. The defendant said that he had smoked some marijuana in New York. The defendant appeared to be sober. Lieutenant Detective Sullivan asked the defendant if he could search his backpack. The defendant replied, “Yeah, go ahead,” in a confident tone. The officer looked into the backpack. There was a long sleeve shirt in the backpack and almost nothing else. There was no toothbrush or other toiletries that might be expected for an overnight trip. Lieutenant Detective Sullivan asked the defendant about this. The defendant said that he had gone to New York to talk to someone about buying some material or clothing for a clothing line.
Detective Haney went into the bus and looked in the bathroom while Lieutenant Detective Sullivan was talking with the defendant outside the bus. There was a cabinet above the toilet where the officer had seen the defendant reaching up and moving his hands. Detective Haney opened the cabinet. He saw two glass-ine bags of blue pills in the cabinet underneath some paper towels. There were more than 1,233 pills contained in the two bags. No one other than the defendant had entered the bathroom after the officer’s announcement of the narcotic check. Detective Haney told Lieutenant Detective Sullivan about the bags of pills in the bathroom.
Lieutenant Detective Sullivan told the defendant that they had seen him go into the bathroom twice. The defendant said that he had left his phone in the bathroom the first time and that he went back to the bathroom to retrieve his phone. The officers knew that this was false because they had seen the defendant *663 using his phone as he came out of the bathroom the first time.
Lieutenant Detective Sullivan went into the bathroom and saw the bags of pills while two officers stayed by the defendant. By the appearance of the pills and the surrounding circumstances, Lieutenant Detective Sullivan believed that the pills were oxycodone pills.
Lieutenant Detective Sullivan returned to the defendant and told him that he was under arrest. He gave the defendant Miranda warnings and asked him if he understood. The defendant said, “What are my options again?” The officer again read the Miranda warnings to the defendant. The defendant said, “I prefer an attorney.” There was no questioning of the defendant and no admissible comment by him after the first Miranda warnings.
C. The Temporary Detaining of the Passengers on the Bus Beginning With the Announcement of the Narcotics Check
The first issue is whether the defendant was subjected to a seizure of his person when Lieutenant Detective Sullivan boarded the bus and announced to all passengers that they would have to remain on the bus for about five minutes while the officers did a narcotics dog check on the stored luggage. For the passengers with stored luggage their actual delay in getting their suitcases and leaving would be no longer than what the average unloading delay would have been if there had been no police involvement. For passengers like the defendant with no stored luggage, however, the announcement of the narcotic check effectively told them that they were about to be delayed on the bus for about five minutes longer than if there had been no police involvement.
Article 14 of the Massachusetts Constitution states that “(e]veiy subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions.” The police “do not effect a seizure merely by asking questions unless the circumstances of the encounter are sufficiently intimidating that a reasonable person would believe he was not free to turn his back on his interrogator and walk away.” Commonwealth v. Sykes, 449 Mass. 308, 310-11 (2007). “Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a ‘seizure’ has occurred.” Id.
Lieutenant Detective Sullivan was polite and respectful in his address to the passengers. His announcement, however, was an assertion of police authority that instructed the passengers that they would have to remain on the bus for the five-minute narcotic dog check on the stored luggage. This announcement amounted to a “seizure” in the form of a temporary police detaining of all the passengers. See Commonwealth v. Stoute, 422 Mass. 783, 786 (1996) (“a person is ‘seized’ by a police officer ‘if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to léave’ ”).
The court recognizes that the defendant displayed a look of panic as soon as the officer announced the narcotic check. Right after the announcement, the defendant began a series of suspicious movements culminating in his second trip to the bathroom when he reached up and moved his arms about in the area above the toilet. All of this took place within the first three or four minutes after the officer announced that the passengers had to stay on the bus during a five-minute narcotic check. Nevertheless, the detaining or seizure of the defendant and the other passengers began when the officer instructed the passengers to remain on the bus for the narcotic check. Under the Massachusetts cases, if the detaining of the defendant on the bus was unlawful when it began, the defendant’s suspicious conduct in response to the officer’s announcement cannot be considered as a basis for initiating the detention. See Stoute, 422 Mass. at 789 (if there is a police pursuit of a suspect without reasonable suspicion to justify the pursuit “any evidence obtained as a result of it pursuit must be suppressed”); Commonwealth v. Borges, 395 Mass. 788, 795-96 (1985).
D. The Issue of the Lawfulness of the Detention of the Passengers During the Five-Minute Drug Interdiction
The next question is whether the brief detaining of the defendant and the other passengers on the bus to conduct the five-minute drug interdiction was unreasonable under the cases interpreting the Massachusetts Constitution.
In the absence of an arrest based on probable cause, a police officer may detain a person and conduct a threshold inquiry if there is a reasonable basis to suspect that the person has committed, is committing, or is about to commit a criminal offense. Commonwealth v. Sykes, 449 Mass. 308, 314 (2007).
There are exceptions to the requirement of individualized reasonable suspicion. Emergency situations sometimes arise that present an immediate danger to the safety of officers or the public. All persons boarding commercial airplane flights are subjected to considerable delays for security screening and searches. Persons entering courthouses are routinely subjected to weapons screening and the attendant delays. Immigration and customs searches are standard for persons entering the United States. In border areas, fixed roadblocks and similar detentions have been permitted to detect and deter illegal immigration. Drivers in all parts of the country also know that they may be occasionally stopped and delayed by the command of a police officer in response to an accident, road repair work or an ordinary traffic snarl.
*664 The detaining of the defendant and the other bus passengers in this case is analogous to roadblocks to detect and deter driving under the influence of alcohol or drugs. For driver sobriety checkpoints the court has permitted an exception to the individual suspicion requirement “on the grounds that a ‘reasonable’ roadblock involves a ‘minimal’ State intrusion upon the reduced privacy of drivers, one that is in any case outweighed by the strong public interest in reducing the carnage caused by drunk drivers.” Commonwealth v. Anderson, 406 Mass. 343, 347 (1989).
In Commonwealth v. Rodriguez, 420 Mass. 577 (2000), however, the court held that “roadblocks for the purpose of searching for evidence of drug trafficking and other contraband violate art. 14.” 420 Mass. at 584-85. The Rodriguez case involved a temporary police roadblock in a high crime area of the city of Holyoke. The court upheld the suppression of marijuana found in the defendant’s vehicle during the officers’ visual observations into the vehicle and a search of the vehicle’s interior with a narcotic detecting dog. The court reasoned that although the drug problem in the United States is “certainly grave,” the “risk that narcotic trafficking poses to the public is not immediate, as is the risk posed by a person operating under the influence.” 420 Mass. at 584.
Trafficking in addictive drugs is extremely harmful to the people of Massachusetts. Illegal drug distribution causes severe, debilitating damage to addicted persons and lasting harm to their families. The Department of Public Health has reported that approximately 1,000 people died in Massachusetts in 2014 from abuse of heroin and other opioids.[1] Under Commonwealth v. Rodriguez, however, the detention of the defendant on the bus for the narcotic interdiction procedure violated the his Article 14 right against unreasonable seizures of his person because the officers detained the defendant before there was any individualized basis to suspect that he was engaged in criminal activity.
E. Suppression of Evidence in Response to an Unlawful Detention
The defendant discarded the oxycodone in a bus bathroom. As the Commonwealth points out, the defendant had no reasonable expectation of privacy regarding the drugs he left in the bathroom because anyone lawfully on the bus could enter the bathroom and find the drugs. See Commonwealth v. Carnes, 81 Mass.App.Ct. 713, 716-18 (2012). One might reasonably argue that the defendant’s voluntary act in discarding the drugs before the police searched or physically detained him should not require suppression of the evidence even if the officers had an insufficient basis to suspect that the defendant was engaged in criminal activity.
The Commonwealth’s memorandum correctly recognizes, however, that under Commonwealth v. Borges, 395 Mass. 788, 796 (1985), a defendant’s attempt to dispose of evidence is not “an independent, intervening act sufficient to justify a subsequent arrest where the disposal is in direct and immediate response” to an unlawful stop or search. See Commonwealth v. Rodriguez, 456 Mass. 578, 587 (2010).
The defendant’s look of panic and his concealing of the oxycodone pills in the bus bathroom was a “direct and immediate response” to the officer’s announcement that the defendant and all the passengers would be detained for about five minutes for the narcotics interdiction procedure. The defendant’s behavior and the oxycodone pills must be suppressed under the Rodriguez and Borges decisions. The defendant’s statements to Lieutenant Detective Sullivan and the dog’s alerting on the defendant’s backpack must also be suppressed. This evidence was the direct product of the detaining of the defendant.
The court need not reach the issue of whether the brief detaining of the defendant and the other passengers on the bus violated the defendant’s rights under the Fourth Amendment to the United States Constitution. See United States v. Drayton, 536 U.S. 194 (2002); Florida v. Bostick, 501 U.S. 129 (1991); Rodriguez v. United States, 2015 WL 1780927 (S.Ct., April 21, 2015).
F. Order
The defendant’s motion to suppress is allowed regarding the officers’ observations of the defendant, the drugs found in the bus bathroom, the defendant’s statements, and the dog’s alerting on the defendant’s backpack.

 http://www.bostonglobe.com/metro/2015/04/28/mo re-than-people-died-from-heroin-and-other-opioids-state-fi gures-show/697gYjFZS6DnuKhREzfEcO/stoiy.html