**Daniel GRANT, Petitioner-Appellant,**

v.

**Louie L. WAINWRIGHT, Director, Florida Division of Corrections, Respondent-Appellee.**

**No. 73–1435.**

United States Court of Appeals, Fifth Circuit.

June 27, 1974.

Rehearing and Rehearing En Banc Denied Oct 18, 1974.

Henry H. Harnage, Miami, Fla. (Court-appointed), for petitioner-appellant.

Robert L. Shevin, Atty. Gen., Tallahassee, Fla., Joel D. Rosenblatt, Asst. Atty. Gen., Miami, Fla., for respondent-appellee.

Before WISDOM and GOLDBERG, Circuit Judges, and LYNNE, District Judge.

GOLDBERG, Circuit Judge:

Shortly after ten o'clock on Saturday morning, June 24, 1961, the body of Mrs. Hyman Nudel was discovered in the back room of a Miami upholstery shop operated by Mrs. Nudel and her husband. Medical testimony established that death was caused by strangulation by hands and ligature such as a cord or wire. There were apparently no eyewitnesses to the murder, and police found no fingerprints or other physical evidence with which they could positively identify the perpetrator.

At about noon on the day of the murder petitioner Daniel Grant, who for several months had been an employee in the Nudels' shop, was picked up and taken to the police department's homicide bureau. The parties are not in complete agreement as to what happened thereafter; however, considering "only the uncontested portions of the record: the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted," Culombe v. Connecticut, 1961, 367 U.S. 568, 604, 81 S.Ct. 1860, 1880, 6 L. Ed.2d 1037, a perhaps incomplete, but certainly unsavory, scenario emerges. Without being warned of his constitutional rights, Grant was questioned regarding his whereabouts that morning. When Grant explained that he had gone by the upholstery shop to borrow some money from Mr. Nudel, he was placed under arrest. From Saturday afternoon until Monday evening, some 53 hours, Grant was incarcerated without being taken before a magistrate. From 6:31 p. m. Monday until 2:00 a. m. Tuesday Grant was questioned intensively by relays of police officers.[1] During that seven and a half hour period Grant was left alone for only two brief intervals; in addition, his wife was brought in to talk to him for about thirty minutes. In the course of the interrogation petitioner was confronted by at least one person to whom he owed money. At approximately 1:20 a. m. Grant was told to take down his pants and to pull out and give to the detectives some of his own pubic hairs, presumably to compare with hairs found on the body of the deceased.[2] The suspect was then required to strip naked while Detectives Shepard and Utes conducted a "physical examination." Detective Holmes told Grant that two abrasions on his knees absolutely indicated his guilt. At that point—approximately

---

1. At least five officers, all of whom are white, were involved in the interrogation. Petitioner is black.

2. No evidence related to any such comparison was ever introduced at trial.

2:00 a. m.—Grant succumbed and confessed to the murder of Mrs. Nudel.[3]

The detectives called a police department stenographer to come to the station, and Grant concluded his formal statement of confession at 2:30 a. m. The statement was then typed, and it was read to and signed by Grant. From that time until about 5:15 a. m. Grant remained in the presence of his accusers and was not permitted to sleep. He was then taken by police officers to the Nudels' upholstery shop and was asked to reenact his confession. After a "dry run" or rehearsal, a movie of the performance was taken, with Grant in jail or prison garb acting the role of the murderer and with a detective playing the role of the victim. Over defense counsel's strenuous objections, this enacted "confession" was shown to the jury at Grant's trial.

On July 11, 1961, some two weeks after the initial confessions, petitioner, who was still incarcerated, complained of headaches and asked to see a doctor. In response the State Attorney's Office sent Dr. Harry Moscowitz, a psychiatrist, to examine Grant. Dr. Moscowitz testified at trial that he "followed the usual format of a psychiatric examination." He determined that the headaches had begun when Grant found a cockroach in his ear and were not of a neurological-psychiatric nature. The psychiatrist then engaged Grant in a

---

3. We emphasize that our synopsis of facts is based solely on undisputed testimony or, in instances of conflicting testimony, on the version of events offered by prosecution witnesses. Under questioning by his attorney at trial, Grant presented a much more pungent account of the moments leading up to his confession:

Q In other words, from 6:00 o'clock at night until 12:00 you were under this repeated questioning?
A Yes.
Q By relays of detectives?
A Yes.
Q And there were about seven or eight of them?
A That is right.
Q What happened after that?
A Well, one of the detectives told me—He said that they would either get what they wanted one way or the other.
Q What did they mean by that?
A That, I didn't know at the time.
Q What did you find out subsequently, if anything, what they meant by that?
A After then they made me pull off my clothes. Detective Shepard came in and made me pull off all my clothes. He had me standing up and he cursed me and said a few different words to me, and he shoved me into the big chair that he was sitting in, and he called me all kinds of names and Detective Utes—
Q At this time you were naked?
A Yes.
Q All right.
A And Detective Nichols brought in some rope and—
Q What kind of rope?
A It was sash cord, I believe it was.
Q All right.

A And Detective Utes had a piece about four feet long, I guess it was, and he had it around my neck and was pulling on it, and Detective Shepard he had a rope, and he made me tie it around my balls, he put his feet up against the desk and he was pulling on it.
Q Were they at this time, while this was going on, interrogating you?
A Yes.
Q What happened?
A It kept going until I couldn't stand it no more.

    *     *     *     *     *

Q What then happened, Daniel, if anything?
A Detective Shepard was still holding the rope and Detective Utes took his rope off, and he went in and got the pictures and he showed it to me, and he asked me didn't I do it, and I said, "No," and Detective Shepard was pulling on the rope, and he said, "You might as well admit it, because I am going to pull until you do;" so he kept pulling it.
Q And you then confessed?
A Until I couldn't take any more, and I confessed.
Q Is that confession true in any way?
A No, sir.
Q Why did you mak it Daniel?
A Because I was afraid and they were hurting me.

Transcript, pp. 478–80. Petitioner's description of the interrogation was contradicted by several participating police officers. We assume that the state court resolved the credibility choices in favor of the prosecution, cf. La Vallee v. Rose, 1973, 410 U.S. 690, 692, 93 S.Ct. 1203, 35 L.Ed.2d 637; therefore, on this appeal we place no reliance on petitioner's disputed testimony.

discussion about why he was in jail and elicited from him a description of the murder that conformed substantially to the initial confession. The state presented Dr. Moscowitz as a witness at Grant's trial, and over strong defense objections, offered Grant's statements to Moscowitz as a third "confession."

Primarily on the basis of the three confessions, Grant was convicted upon a trial by jury in December 1961 for first degree murder and was sentenced to death. The conviction was affirmed by the Supreme Court of Florida, with two Justices dissenting. Grant v. State, Fla.1965, 171 So.2d 361. The present appeal is from an order of the United States District Court for the Southern District of Florida dismissing, without a hearing, Grant's petition for writ of habeas corpus. Petitioner asks that we reverse the district court's order and grant the writ on the grounds that: (1) all three of the confessions were involuntary and their admission into evidence was a denial of due process; (2) admission of the filmed reenactment into evidence at trial was so highly prejudicial and inflammatory as to deny petitioner his constitutional right to a fair trial; and (3) the state trial court erroneously and harmfully limited inquiry by defense counsel into an alleged confession by Mr. Nudel. We agree with petitioner that the confessions upon which he was convicted were involuntary and that he is therefore in custody in violation of the Constitution. Because petitioner is entitled to relief on this ground, we do not reach the other issues raised on appeal.

■ In the landmark decision of Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the Supreme Court delineated specific procedures to safeguard the Fifth Amendment privilege against self-incrimination during in-custody interrogations. If Daniel Grant's trial had taken place after the date of the *Miranda* decision, the invol-

untariness and inadmissibility of his confessions would be established beyond peradventure. We recognize that the strict requirements of *Miranda* are not to be applied retroactively. Johnson v. New Jersey, 1966, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. *Miranda*, however, neither invoked a miracle nor marked the genesis of judicial vigilance prior to which the courts were oblivious to overzealous and abusive police interrogation practices. That decision was simply a milestone in the steady advance of Anglo-Saxon jurisprudence in the civilized treatment of the criminally accused. Only five years after the Wickersham Commission aroused public consciousness with its famous report on police abuses,[4] the Supreme Court reversed a Mississippi conviction based on confessions obtained by whipping the accused with a buckle-adorned leather strap. Brown v. Mississippi, 1936, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682. In his forceful opinion for the Court, Chief Justice Hughes served notice—thirty years before *Miranda*—that "[t]he rack and the torture chamber may not be substituted for the witness stand," 297 U.S. at 285–286, and that these and other barbaric paraphernalia designed to extract and extort confessions would be denounced and proscribed when evidenced.

Although the facts of subsequent cases never reached the level of brutality of the beatings in *Brown*, the Court continued to scrutinize confessions. The Supreme Court long "has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." Blackburn v. Alabama, 1960, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242. As the Court noted in Spano v. New York, 1959, 360 U.S. 315, 321, 79 S.Ct. 1202, 1206, 3 L.Ed.2d 1265,

as law enforcement officers become more responsible, and the methods

---

4. U.S. National Comm'n on Law Observance and Enforcement, Report on Lawlessness in Law Enforcement (1931).

used to extract confessions more sophisticated, our duty to enforce federal constitutional protections does not cease. It only becomes more difficult because of the more delicate judgments to be made.

Writing for the majority in Davis v. North Carolina, 1966, 384 U.S. 737, 740, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895, Chief Justice Warren declared that

> the nonretroactivity of the decision in *Miranda* does not affect the duty of courts to consider claims that a statement was taken under circumstances which violate the standards of voluntariness which had begun to evolve long prior to our decisions in *Miranda* and Escobedo v. Illinois, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977] (1964). This Court has undertaken to review the voluntariness of statements obtained by police in state cases since Brown v. Mississippi . . . .
> The standard of voluntariness which has evolved in state cases under the Due Process Clause of the Fourteenth Amendment is the same general standard which applied in federal prosecutions—a standard grounded in the policies of the privilege against self-incrimination. Malloy v. Hogan, 378 U.S. 1, 6–8 [84 S.Ct. 1489, 1492–1493, 12 L.Ed.2d 653] (1964).

Thus, "voluntariness" was not a new word introduced by *Miranda* into our jurisprudential lexicon, and the prospectivity of that decision did not bless all previous confessions. *See generally* Developments in the Law—Confessions, 79 Harv.L.Rev. 935, 938–1036 (1966).

■■ The test for admissibility of a confession in a pre-*Miranda* case is whether, considering the "totality of the circumstances," the defendant's statements were voluntary. Clewis v. Texas, 1967, 386 U.S. 707, 708, 87 S.Ct. 1338, 18 L.Ed.2d 423; Fikes v. Alabama, 1957, 352 U.S. 191, 197, 77 S.Ct. 281, 1 L.Ed.2d 246. Such a standard is, of course, easier to state than to apply. We know of no simple measuring device that would enable us to compare the relative reliability of confessions, the relative outrageousness of interrogation techniques, or the relative extent to which the wills of accused persons have been overborne. The variety of methods used to extract confessions, and the number of possible combinations and permutations of those methods, render any linear comparison impossible. Thus, we cannot say that Grant's incarceration for at least 53 hours without being taken before a magistrate renders his confession involuntary *per se*, even though the Supreme Court has reversed a state court finding of voluntariness when the accused was incarcerated only· some 38 hours before being charged. Clewis v. Texas, *supra; see also* Darwin v. Connecticut, 1968, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630. Similarly, we cannot hold the confession involuntary *solely* on the ground that Grant was subjected to intensive interrogation for seven and a half hours by relays of white police officers. Nevertheless, when the extended confinement and the exhaustive questioning are considered together and in combination with the confrontation by a creditor, the demand that petitioner pull out his own pubic hairs, and the early morning physical examination followed by the officer's authoritative statement that abrasions on petitioner's knees proved his guilt, there can be no doubt that the resulting confession was involuntary.

In reaching our conclusion we are not unmindful of the substantial weight that is to be accorded to state court determinations. However, as Justice Frankfurter wrote for the Court five years before the *Miranda* decision,

> where, on the uncontested external happenings, coercive forces set in motion by state law enforcement officials are unmistakably in action; where these forces, under all the prevailing states of stress, are powerful enough to draw forth a confession; where, in fact, the confession does come forth and is claimed by the defendant to have been extorted from him; and where he has acted as a

man would act who is subjected to such an extracting process—where this is all that appears in the record —a State's judgment that the confession was voluntary cannot stand.

Culombe v. Connecticut, *supra*, 367 U.S. at 605. The tactics employed by police officers in extracting a confession from Grant in 1961 were just the type of procedures that led to the decisions in *Miranda* and in Escobedo v. Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. These extractive techniques shock our pre as well as our post-*Miranda* consciences. A confession induced by such tactics cannot be considered voluntary under any standard and should not have been admitted as evidence to establish petitioner's guilt.

■ The second and third "confessions"—the filmed reenactment of the crime and the statement to the psychiatrist—cannot be separated from the circumstances surrounding the first confession, and they too must be held inadmissible. The reenactment was staged at approximately 5:00 a. m., only a couple of hours after the initial confession; petitioner, who had been questioned intensively for the entire evening and night, had no opportunity to sleep before being taken to the scene of the crime. Whether or not these features might have pre-

vented the screenplay from being denominated a four-star cinematic production of Academy Award standards, they should at best have required the movie to be X-rated and banned from use in the courtroom for confession purposes.

Although Grant's inculpatory statements to Dr. Moscowitz followed the initial confession and reenactment by two weeks, Grant had been in jail for the entire period. The record gives no indication that petitioner had spoken with counsel at any time during those two weeks or that any other event or circumstance had intervened that might isolate the encounter with the psychiatrist from the effects of the prior confessions.

As the Supreme Court has observed,

after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession *always may* be looked upon as fruit of the first.

United States v. Bayer, 1947, 331 U.S. 532, 540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654.[5] The Court in *Bayer*, sustaining a trial court's refusal to suppress a "supplementary" confession, declined to

---

5. The impact of the original confession may be just as great when the initial confession was false and did not actually involve "letting the cat out of the bag." This would be particularly true where, as here, the accused has not only repeated his confession but has also reenacted his alleged crime several times for the benefit of law enforcement authorities. In his study of the psychology of confessions, Professor Edwin Driver explained the coercive effect of this type of repetition:

> The tactics of having the suspect "repeat his story over and over" and asking him to try to fill in the details of the crime which has only been described to him in outline are manipulations towards self-persuasion, not necessarily attempts to trip up the suspect in lies. For if duped into playing the part of the criminal in an imaginary sociodrama, the suspect may come to believe that he was the central actor in the real crime. Experiments in-

dicate that ororverbalization in role playing increases the effectiveness of an effort at persuasion in two ways. First, the actor may be impressed by his own arguments, illustrations, and appeals; and, second, he may experience a sense of achievement or satisfaction with his own performance. More shocking perhaps is that if a play-acting confession is made in the presence of certain "truth signals," the suspect may later have difficulty accurately recalling what in fact happened . . . . Thus, a suspect accustomed to telling the truth to large, kindly, persistent men or used to responding truthfully to innocuous introductory questions may have his memory seriously clouded, or even may come to believe the false statements he makes in this context.

Driver, Confessions and the Social Psychology of Coercion, 82 Harv.L.Rev. 42, 53–54 (1968).

adopt a *per se* rule that would permit one confession made "under circumstances which preclude its use, perpetually [to disable] the confessor from making a usable one after those conditions have been removed." 331 U.S. at 541. The second confession in *Bayer*, however, followed the involuntary one by six months, during which time the defendant was under only very limited restraint on a military base; before making the second statement the defendant was given fair warning that it might be used against him. In Clewis v. Texas, *supra*, the accused gave three confessions to police: the first on July 9, the day after his arrest; the second on July 12; and the third on July 17. For the four days preceding his final statement, Clewis was in the county jail, but was neither interrogated nor abused and was permitted adequate food and sleep. During questioning on July 17, however, he was not advised of his right to remain silent or to have counsel appointed. After finding Clewis' first two confessions involuntary because of impermissible interrogation techniques, the Court concluded:

> On this record, we cannot hold that petitioner's third statement was voluntary. It plainly cannot, on these facts, be separated from the circumstances surrounding the two earlier "confessions." There is here no break in the stream of events from the time Sunday morning when petitioner was taken to the police station to the time Tuesday morning some nine days later that he signed the statement in issue, sufficient to insulate the statement from the effect of all that went before.

Clewis v. Texas, *supra*, 386 U.S. at 710. *See also* Darwin v. Connecticut, *supra*; Beecher v. Alabama, 1967, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35. Our examination of the record of Daniel Grant's interrogation and detention convinces us that, as in the ordeal of Marvin Clewis,

there was "no break in the stream of events . . . sufficient to insulate" Grant's statement to Dr. Moscowitz from the kaleidoscopic "effect of all that went before." Indeed, the involuntariness of Grant's final statement is greatly increased by the fact that it was induced by one who was represented to the prisoner as a doctor to treat his headaches, but who was actually a psychiatrist sent by the State Attorney's Office and who was following "the usual format of a psychiatric examination." *Cf.* Leyra v. Denno, 1954, 347 U.S. 556, 559–560, 74 S.Ct. 716, 98 L.Ed. 948.

Judges as well as law enforcement authorities must always remain vigilant lest we forget the sage admonition of Chief Justice Warren regarding the use of abusive practices to obtain confessions:

> The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.

Spano v. New York, *supra*, 360 U.S. at 320–321. Petitioner Grant's "confessions" were in no sense voluntary, and they should not have been admitted as evidence against him. Because petitioner's detention is in violation of the Constitution of the United States, he is entitled to be released. We therefore reverse the judgment of the district court and remand with instructions to grant the petition for writ of habeas corpus, subject to the right of the State, if it wishes to do so, to retry petitioner on the indictment here involved within ninety days after the mandate of this Court reaches the district court.

Reversed.