APPEALS COURT 
 
 COMMONWEALTH vs. MICHAEL A. HAND

 
 Docket:
 22-P-1132
 
 
 Dates:
 October 4, 2023 – October 21, 2024
 
 
 Present:
 Neyman, Henry, & Ditkoff, JJ.
 
 
 County:
 Plymouth
 

 
 Keywords:
 Homicide. Constitutional Law, Admissions and confessions, Voluntariness of statement, Result of illegal interrogation. Due Process of Law, Police custody. Practice, Criminal, Motion to suppress, Admissions and confessions, Voluntariness of confession.
 
 

             Indictment found and returned in the Superior Court Department on May 22, 2018.
            Pretrial motions to suppress evidence were heard by Cornelius J. Moriarty, II, J., and Brian A. Davis, J.
            An application for leave to prosecute an interlocutory appeal was allowed by Serge Georges, Jr., J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.
            Cailin M. Campbell, Assistant District Attorney, for the Commonwealth.
            Rebecca Kiley, Committee for Public Counsel Services, for the defendant.
            DITKOFF, J.  On May 22, 2018, a grand jury indicted the defendant, Michael A. Hand, for the crime of murder in the first degree, G. L. c. 265, § 1.  A Superior Court judge suppressed part of the defendant's confession to police, finding that it was coerced by the length and manner of the two-day interrogation in light of the defendant's cognitive limitations.  A second Superior Court judge issued an order suppressing similar statements made by the defendant to his pastor approximately one hour after the police dropped the defendant off at his home while they sought an arrest warrant.  The Commonwealth now appeals the second suppression order.  As the record shows that the police had placed the defendant in a state of extreme fatigue and resignation to such an extent that this fatigue and resignation would be expected to last for several hours, we find no error in the second motion judge's conclusion that the defendant remained under the influence of the police coercion when he spoke to his pastor.  Accordingly, we affirm.
            1.  Background.  a.  The crime and investigation.  The fifteen year old victim, Tracy Gilpin, was reported missing on October 2, 1986.  Twenty days later, her partially clothed[1] body was found in the Myles Standish State Forest hidden under leaves and brush and with a seventy-four pound rock on her face.  The cause of death was multiple skull fractures.
            More than thirty years after the victim's death, police learned that the defendant and a now-deceased man named Mickey MacLean had been with the victim at the defendant's house the night before her disappearance was reported.  Two Massachusetts State troopers traveled to the defendant's home in Troutman, North Carolina to interview him.  The troopers asked him if he would be willing to speak with them at a nearby police station (where there was recording equipment).  The defendant agreed, and, at his request, the troopers drove him to the station.
            At the time of the interviews, the defendant was fifty-nine years old.  He was mostly in good health, but he had been found unconscious and hospitalized three years prior.  The defendant has an intelligence quotient of eighty-six, which is below average, and a clinical neuropsychologist tested the defendant and determined that he had significant memory impairments, difficulties with attention, concentration, verbal reasoning, problem solving, impulsivity, and a susceptibility to suggestion.  He had been employed as a stone sculptor for about twenty years and was self-sufficient.  He was familiar with the criminal justice system because he had been arrested for several misdemeanors and felonies in the past.
            The defendant participated in interviews on March 7 and 9, 2018.  Initially, the defendant was not a suspect (the troopers appeared to suspect MacLean was the murderer).[2]  About an hour into the first interview, the officers asked the defendant if he would provide a deoxyribonucleic acid sample, and he agreed to do so.  As the first motion judge aptly put it, "Immediately thereafter, without any prodding whatsoever, the defendant placed himself [at the crime scene] by virtue of several stunning inculpatory statements."  The defendant claimed that he saw the victim leave a gas station with Henry Meinholz, a man who later sexually assaulted and killed a thirteen year old girl, see Commonwealth v. Meinholz, 420 Mass. 633, 634 (1995), and whom the troopers (but presumably not the defendant) knew to have been out of state when the victim was murdered.  The defendant claimed that he followed Meinholz from a gas station and, notwithstanding Meinholz's five minute head start, tracked him to the State forest.  The defendant claimed that, after about ten minutes, he saw Meinholz emerge from the woods with a tarp and shovel.  At Meinholz's instruction, the defendant followed him into the woods and touched a rock, scraping his finger on it.[3]
            At this point, the officers informed the defendant of his Miranda rights (although he was not under arrest).  The subsequent six hours of the first interview were "confrontational, accusatory and intense," with the troopers accusing the defendant of lying, repeatedly calling the defendant names like "gross," and providing the defendant with fake inculpatory details.  Although the troopers repeatedly suggested that the victim's death might have been an accident, the defendant steadfastly denied killing her.  The first day of questioning ended when the defendant asked to go home to take his medicine.
            Two days later, the defendant returned to the police station, where he took a four-hour polygraph test and then was interrogated for an additional three and one-half hours.  During this interview, the troopers told the defendant that, if he came clean, they would help him.  The defendant eventually said that he had picked up the rock to look underneath it.
            After the defendant had been at the police station for approximately seven hours, the defendant was left alone in the interview room with the audio-visual system still recording.  As the first motion judge described it, "The video depicts him as dejected and physically exhausted.  He is heard muttering to himself several times that he wanted to go home and take his medicine."  In fact, that description understates the defendant's condition.  During that break, the defendant was breathing heavily.  He apparently was so tired that he repeatedly shifted positions as if trying to get comfortable enough to rest.  He exhibited physical pain when he briefly stood up to throw away a cup.  In addition to repeatedly muttering that he wanted to go home and take his medicine, he also repeatedly muttered incoherently to himself.
            When the troopers returned to the room, the defendant said that he wanted to go home and take his medicine, and the troopers indicated that he could and asked if he would be willing to return the next day.  The defendant said, "If I have to," and a trooper told him, "You don't have to.  It's your call, man."
            At that point, the defendant started talking about the crime again.  He said, "I do admit I held back on moving that rock," and admitted that he "moved it."  A trooper asked him, "Where did you move it to?"  When the defendant demonstrated where he moved it, a trooper asked, "Is it possible you could have hit her at that point with it?"  The defendant responded, "I don't know."  After further discussion, the same trooper announced that his opinion was that the "rock was picked up and dropped on her face."  The defendant said, "It very well could have happened that way."  The trooper then repeatedly asserted that the defendant did that, and the defendant eventually accepted that narrative and tried to explain that it was an accident.  Nonetheless, he still asserted -- without any evident consciousness of the inconsistency -- that he did not realize he had dropped the rock or injured the victim.  He soon went back to describing himself merely as moving the rock, and the trooper told the defendant that he "dropped it on her head."  Again, the defendant accepted the trooper's correction, but then immediately went back to denying that he killed the victim.
            The second interview ended at 4:51 P.M.  The video recording shows that the defendant's fatigue, if anything, had increased by that point and he was leaning against the wall for support as he exited the interview room.  The troopers drove the defendant back to his home, a trip that took approximately fifteen to twenty minutes.[4]  The troopers dropped him off at "5:30ish."  At the second suppression hearing, a trooper described the defendant as "alert" in the motor vehicle, but did not suggest that the defendant's fatigue, desperation, or resignation had improved by the end of the ride.
            At some point between 6:30 P.M. and 7 P.M., the defendant called his pastor.  The pastor could tell by the defendant's "tone and the conversation" that the defendant "was disturbed" and "rattled."  The pastor could hear "desperation in his voice."  The pastor believed -- and the parties agree -- that the defendant was not seeking religious advice or guidance when he called the pastor.  The defendant informed the pastor that "the Massachusetts State Police were there to arrest him and that he needed for [the pastor] to come to his home and take some paper to somebody there in the area."  He expected "to be arrested at any time."
            The pastor could not come to the defendant's home because he was watching his grandchildren.  He asked the defendant what was going on, and the defendant said that "they were coming to arrest him over a murder that had taken place 30 years prior."  He stated that "he had went into the woods looking for a young lady that had gone off with another male individual, and that when he found her, he saw her . . . up under some brush."  He then "knocked some rocks off on her head" or "threw the rock."  The entire conversation was less than five minutes.
            The troopers obtained an arrest warrant in Massachusetts for the defendant at approximately 6:20 P.M.  They then obtained a North Carolina fugitive from justice warrant and arrested him around 9 P.M.
            The pastor's son was a reserve police officer in Troutman.  The son later told the pastor that the defendant had been arrested.  The pastor told his son about the conversation, and his son convinced him to go to the police.
            b.  First suppression order.  The defendant moved to suppress statements that he made during the March 7 and 9 questioning, primarily arguing that his statements were not voluntary.  The first motion judge suppressed the statements that the defendant made after the troopers returned to the room near the end of the March 9 interview because "the defendant's will was gradually overborne by the length of the interrogation, the manner of the interrogation, the use of disfavored investigative techniques, and the defendant's cognitive limitations."  The defendant's motion was otherwise denied.  The Commonwealth did not appeal.
            c.  Second suppression order.  The defendant moved to suppress the defendant's statements to his pastor as tainted by the statements suppressed in the first order.  The second motion judge found that the defendant made the statements to the pastor because he had "the explicit belief that he was about to be arrested for [the victim's] murder on account of the statements he had given to the police earlier in the day."  The judge further found that there was no meaningful break in the stream of events because the defendant remained "'disturbed,' 'distressed,' 'desperate,' and 'frustrated,'" and that the "Defendant plainly believed that any effort to withhold 'further information' from [the pastor] 'would be futile,' and that 'he had nothing to lose by repetition or amplification of [his] earlier statements.'  [Commonwealth v. Rosa-Roman, 485 Mass. 617,] 630 [(2020)]."  The judge suppressed the conversation, finding that there had been no meaningful break in the stream of events and that the "cat-out-of-the-bag" doctrine applied.  This appeal, authorized by a single justice of the Supreme Judicial Court, followed.
            2.  Standard of review.  "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.'"  Commonwealth v. Fisher, 492 Mass. 823, 837-838 (2023), quoting Commonwealth v. Medina, 485 Mass. 296, 299-300 (2020).  "Our appellate function requires that we make our own independent determination on the correctness of the judge's application of the constitutional principles to the facts as found."  Commonwealth v. Earl, 102 Mass. App. Ct. 664, 668 (2023), quoting Commonwealth v. Groome, 435 Mass. 201, 211 (2001).
            3.  Involuntariness of the first statement.  The Commonwealth argues that there can be no taint affecting the second statement because the first motion judge erred in finding that any portion of the police interviews was involuntary.[5]  "We review video footage independently," Commonwealth v. Morris, 492 Mass. 498, 502 (2023), and will vacate a suppression order where we "take a view quite different from what the motion judge did as to what the recording reveals about the defendant's condition."  Commonwealth v. Tremblay, 480 Mass. 645, 656 (2018).  Putting aside the question whether the Commonwealth can raise this issue on appeal when it was not raised to the second motion judge, see Commonwealth v. Fredericq, 482 Mass. 70, 84 n.9 (2019), we agree with the first motion judge that the defendant's statements towards the end of the March 9 interview were involuntary.
            The defendant's will was overborne by the end of the March 9 interview.  After two days of intense interrogation, during which the troopers repeatedly threw accusations at the defendant, called him names, misrepresented his previous statements, and told him that his polygraph proved he was lying, the defendant was emotionally and physically exhausted and wanted to go home.  After the last break, where he repeatedly said that he wanted to go home and showed outwards signs of his exhaustion, he transitioned from mostly pushing back on the troopers' accusations to mostly adopting the accusations and the details that they fed him.  Where the defendant started adopting the troopers' suggestions only after being emotionally broken by the troopers' improper interrogation techniques, the defendant's statements after the last break were involuntary.  See Commonwealth v. Magee, 423 Mass. 381, 388 (1996) ("the promise that the defendant would receive the medical treatment she consistently requested, in return for her statement to the police regarding her involvement in the death of her child, constituted a form of psychological coercion which, in view of the defendant's debilitated physical and emotional state and the physical and temporal circumstances of the interrogations, rendered the statements involuntary").  Cf. Commonwealth v. Monroe, 472 Mass. 461, 469-471 (2015) (confession involuntary where emotionally disturbed defendant made inculpatory statements after detectives threatened that defendant would not have contact with his daughter unless he confessed).
            4.  Subsequent statements after an involuntary statement.  a.  The proper test.  Proper resolution of this case requires an understanding of the important distinction, in both Federal and Massachusetts law, between a statement after a coerced confession and a statement after a technical violation of a defendant's Miranda rights.  See Miranda v. Arizona, 384 U.S. 436 (1966).  Under Federal law, where a voluntary statement is elicited in violation of Miranda rights, there is no presumption that a subsequent statement is tainted; rather, "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."  Oregon v. Elstad, 470 U.S. 298, 309 (1985).
            Federal law, however, is quite different where the initial statement was involuntary.  The Supreme Court limited its holding in Elstad, 470 U.S. at 308, to "the alleged 'fruit' of a noncoercive Miranda violation."  As the Court explained, this was because "unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment [to the United States Constitution] must nevertheless be excluded from evidence under Miranda."  Elstad, supra at 307.
            The United States Supreme Court has consistently distinguished between voluntary statements obtained in violation of Miranda and statements that are actually involuntary.  See, e.g., Vega v. Tekoh, 597 U.S.134, 135 (2022), citing Harris v. New York, 401 U.S. 222, 224-226 (1971) ("a statement obtained in violation of Miranda could be used to impeach the testimony of a defendant, even though an involuntary statement obtained in violation of the Fifth Amendment could not have been employed in this way"); New York v. Quarles, 467 U.S. 649, 654 (1984) (noting "we have before us no claim that respondent's statements were actually compelled by police conduct which overcame his will to resist"); Mincey v. Arizona, 437 U.S. 385, 398 (1978) ("any criminal trial use against a defendant of his involuntary statement is a denial of due process of law"); Michigan v. Tucker, 417 U.S. 433, 445 (1974) (defendant's "statements could hardly be termed involuntary as that term has been defined in the decisions of this Court"); Harris, supra at 224 (statements obtained in violation of Miranda may be used to impeach defendant's testimony where there is "no claim that the statements made to the police were coerced or involuntary").  The Court has "repeatedly explained 'that those subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial."  United States v. Patane, 542 U.S. 630, 640 (2004), quoting Chavez v. Martinez, 538 U.S. 760, 769 (2003) (plurality opinion).
            In the case of a statement after an involuntary confession, "[t]he question of whether those confessions subsequently given are themselves voluntary depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances."  Lyons v. Oklahoma, 322 U.S. 596, 602 (1944).  The question is whether the "effect of earlier abuse . . . dominated the mind of the accused to such an extent that the later confession is involuntary."  Id. at 603.
            Under this Supreme Court precedent, a confession after an involuntary confession is inadmissible where "there was 'no break in the stream of events' . . . 'sufficient to insulate' the final events 'from the effect of all that went before.'"  Darwin v. Connecticut, 391 U.S. 346, 349 (1968), quoting Clewis v. Texas, 386 U.S. 707, 710 (1967).  Accord Beecher v. Alabama, 408 U.S. 234, 237 (1972) (Beecher II), quoting Beecher v. Alabama, 389 U.S. 35, 38 (1967) (per curiam) (subsequent confession inadmissible where it was "a part of the same 'stream of events'").
            As fleshed out by our colleagues in the Federal appellate courts, the Federal standard requires that "[t]he government . . . show intervening circumstances which indicate that the second confession was insulated from the effect of all that went before."  United States v. Lopez, 437 F.3d 1059, 1066 (10th Cir. 2006), quoting United States v. Perdue, 8 F.3d 1455, 1467 (10th Cir. 1993).  Or to put it another way, "courts may hold some of the confessions involuntary and others not only if such a distinction is justified by a sufficiently isolating break in the stream of events."  Leon v. Wainwright, 734 F.2d 770, 772 (11th Cir. 1984).  Accord United States v. Ambrose, 668 F.3d 943, 955 (7th Cir. 2012).  "This question, in turn, depends upon a number of subsidiary factors, including 'the time that passed between confessions, the change in the place of interrogations, and the change in identity of the interrogators.'"  Holland v. McGinnis, 963 F.2d 1044, 1050 (7th Cir. 1992), cert. denied, 506 U.S. 1082 (1993), quoting Elstad, 470 U.S. at 310.  Accord United States v. Patterson, 812 F.2d 1188, 1192 (9th Cir. 1987).  "No single factor is determinative; rather, all three must be considered in the aggregate."  Watson v. DeTella, 122 F.3d 450, 454 (7th Cir. 1997).
            This distinction, so dramatically drawn in Federal court, is less visible in Massachusetts.  That is because the Supreme Judicial Court rejected the holding in Elstad and presumes taint from a voluntary statement obtained in violation of Miranda.  See Commonwealth v. Smith, 412 Mass. 823, 836 (1992).  The Commonwealth may overcome the presumption of taint from a voluntary statement obtained in violation of Miranda "by showing that either:  (1) after the illegally obtained statement, there was a break in the stream of events that sufficiently insulated the post-Miranda statement from the tainted one; or (2) the illegally obtained statement did not incriminate the defendant, or, as it is more colloquially put, the cat was not out of the bag."  Rosa-Roman, 485 Mass. at 629, quoting Tremblay, 480 Mass. at 658 n.9.  Accord Commonwealth v. Jones, 95 Mass. App. Ct. 641, 651 (2019); Commonwealth v. Harris, 75 Mass. App. Ct. 696, 699 (2009); Commonwealth v. Mark M., 65 Mass. App. Ct. 703, 706 (2006).[6]  The first method of overcoming the presumed taint  showing a break in the stream of events -- mirrors Federal law in the context of the taint from involuntary statements.
            The second method of overcoming the presumed taint -- showing that the cat was not out of the bag -- is not a valid manner of overcoming the taint of a coerced statement as a matter of Federal constitutional law.  This phrase first appears in Supreme Court jurisprudence in United States v. Bayer, 331 U.S. 532, 540-541 (1947), where the Supreme Court rejected it as a basis for suppression.  It has since been rejected again in Elstad, 470 U.S. at 303-304, 311-312.  See Missouri v. Seibert, 542 U.S. 600, 615 (2004) ("Elstad rejected the 'cat out of the bag' theory").[7]  Thus, proving that the cat was not out of the bag is not a valid method for the Commonwealth to overcome the taint of a coerced confession under Federal law.
            Our jurisprudence, although not exploring the difference with precision, is not to the contrary.  In Commonwealth v. Meehan, 377 Mass. 552, 570-571 (1979), involving a subsequent statement after an involuntary statement, the Supreme Judicial Court applied only the stream of events analysis.  In Commonwealth v. Mahnke, 368 Mass. 662, 683-688 (1975), cert. denied, 425 U.S. 959 (1976), the Supreme Judicial Court applied both the stream of events test and the "cat out of the bag" test in a case where the initial statement was coerced by civilians, but appeared to suggest that failing either test would make the statement inadmissible.[8]  In any event, Mahnke was not controlled by Federal law, which applies only where the initial involuntary statement was coerced by State actors.  See Colorado v. Connelly, 479 U.S. 157, 165 (1986) ("Our 'involuntary confession' jurisprudence is entirely consistent with the settled law requiring some sort of 'state action' to support a claim of violation of the Due Process Clause of the Fourteenth Amendment").[9]
            b.  Application.  In applying the break in the stream of events test, many of the cases in Massachusetts regarding taint from an improper confession are of limited utility because they involve cases where the earlier, improper confession was voluntary.  See, e.g., Rosa-Roman, 485 Mass. at 628 (failure to honor invocation of right to counsel); Commonwealth v. Thomas, 469 Mass. 531, 539 (2014) (same); Commonwealth v. Damiano, 422 Mass. 10, 12-13 (1996) (failure to give Miranda warnings); Commonwealth v. Osachuk, 418 Mass. 229, 234 (1994) (same); Smith, 412 Mass. at 829 (same); Commonwealth v. Watkins, 375 Mass. 472, 478 (1978), S.C., 486 Mass. 801 and 486 Mass. 1021 (2021) (failure to honor invocation of right of counsel); Commonwealth v. Haas, 373 Mass. 545, 553-554 (1977), S.C., 398 Mass. 806 (1986) (failure to give Miranda warnings); Harris, 75 Mass. App. Ct. at 699 (same); Mark M., 65 Mass. App. Ct. at 706-707 (failure to provide juvenile with opportunity to consult with parent or other interested adult).  Of course, as with coerced statements, a change in location or in the questioning officer and the passage of time often can break the stream of illegality.  See Rosa-Roman, supra at 631 (break in stream where two hours passed, defendant was transported to new location, and different officer read defendant Miranda rights before questioning him); Thomas, supra at 551 (no break in stream where only twenty minutes passed and same officers were involved); Damiano, supra at 13 (no break in stream where "questioning was continuous"); Osachuk, supra at 236 (no break in stream where, despite brief pause, "[t]he third statement was the product of a continuous interrogation; the defendant never left the room and never spoke to anyone other than Inspector Farnum"); Smith, supra at 832 (no break in stream where "both statements were the result of a single continuous interrogation"); Watkins, supra at 482 (break in stream of events where defendant communicated with family and was given opportunity to call attorney); Haas, supra at 554 (no break in stream where "the proper police questioning followed so closely their illegal interrogation" in same location by same officers); Harris, supra at 700 (break in stream where two hours passed, different officers, and different location); Mark M., supra at 708 (no break in stream where several minutes passed, same officer, same location).  Nonetheless, what is necessary to break the stream of events to insulate a subsequent statement from actual coercion can be quite different in kind from what is necessary to insulate a subsequent statement from a technical Miranda violation.
            We find more useful cases involving overcoming the taint of involuntary statements.  In Commonwealth v. Pileeki, 62 Mass. App. Ct. 505, 507 (2004), the defendant's first statement was involuntary "because of her intoxication and emotional instability."  A break in the stream of events existed because "[t]he judge found, and upon review of the tape recordings of the interview, we agree[d], that the intoxication and emotional distress had significantly receded by the time the defendant gave" the subsequent statements.  Id. at 509.  In Meehan, 377 Mass. at 567-568, a confession was involuntary because of the defendant's youth, poor education, intoxication, inability to reach family or friends, and "being told that the case against him was established and after receiving assurance that the confession would assist his defense."  A few hours later, the defendant's family arrived, and he confessed to his mother in front of the police.  Id. at 569.  The court found no break in the stream of events, as "[t]he statement was made a relatively short time after the confession, and at the same place; it was corroborative of the confession; [and] there was no opportunity for consultation with family."  Id. at 570.
            The case of Mahnke, 368 Mass. at 683, is helpful, though it is not precisely on point because a group of civilians coerced a confession from the defendant.  The civilians coerced a confession from the defendant "in a remote hunting cabin" through "continuous rough questioning and threats."  Id.  The court found a break in the stream of events before the defendant's later statements "[g]iven the opportunities for escape, the lack of physical restraint, and the defendant's possession of [a] weapon."  Id. at 685.  Similarly helpful is Commonwealth v. Prater, 420 Mass. 569, 578-579 (1995), where, although the motion judge did not address whether the defendant's first confession itself was voluntary, the judge found that the waiver of Miranda rights was involuntary because of intoxication.  There, the court affirmed the motion judge's finding that "the passage of [ninety minutes] and the defendant's appearance of sobriety on the videotape support his implicit conclusion that there was a break in the stream of events between the first and second confessions."  Id. at 582-583.  In all of these cases, the court considered whether the coercion had dissipated by the time of the subsequent statement.
            Here, the defendant's subsequent statements were given in a different location -- his home, rather than the police station  and to a different audience -- his pastor, rather than the police officers -- and went from interrogation to open-ended questioning.  As stated, such factors weigh in favor of finding a break in the stream of events adequate to insulate the new statements from the prior coercion.  See, e.g., Holland, 963 F.2d at 1050-1051; Leon, 734 F.2d at 773; Murray v. State, 12 P.3d 784, 791 (Alaska Ct. App. 2000); State v. O'Hara, 627 A.2d 1001, 1004 (Me. 1993); Smith v. State, 547 S.W.2d 6, 10-11 (Tex. Crim. App. 1977).
            On the other hand, although the time frame is never decisive by itself, the passage of time here was shorter than generally seen in cases where there is a break in the stream of events.  See, e.g., Prater, 420 Mass. at 576 (ninety minutes); Mahnke, 368 Mass. at 671-672 (approximately four hours); Pileeki, 62 Mass. App. Ct. at 507 (between two and three hours); Holland, 963 F.2d at 1051 (six hours); Leon, 734 F.2d at 773 (twelve hours); State v. Schroff, 206 Conn. 182, 198 (1988) (almost two months); State v. Carlson, 318 N.W.2d 308, 311 (N.D.), cert. denied, 459 U.S. 1040 (1982) (nearly twenty-four hours).  Contrast Beecher II, 408 U.S. at 235, 236-237 (no break in stream of event after one hour); Meehan, 377 Mass. at 556-557 (approximately three hours); People v. Springsted, 410 P.3d 702, 717 (Colo. App. 2016) (eleven minutes); People v. Reed, 123 Ill. App. 3d 52, 60-61 (1984) (four hours); People v. Czaja, 97 Ill. App. 3d 958, 963 (1981) (forty-five minutes); State v. Swanigan, 279 Kan. 18, 43 (2005) (nineteen hours).  In this regard, "[t]he critical question with respect to attenuation is not the length of time between a previously coerced confession and the present confession, it is the length of time between the removal of the coercive circumstances and the present confession."  United States v. Karake, 443 F. Supp. 2d 8, 89 (D.D.C. 2006).
            With these factors in mind, we must determine whether there was error in the second motion judge's finding that there was no "'break in the stream of events' . . . 'sufficient to insulate' the final events 'from the effect of all that went before.'"  Darwin, 391 U.S. at 349, quoting Clewis, 386 U.S. at 710.  Accord Rosa-Roman, 485 Mass. at 629.  More concretely, our goal is to determine whether the second motion judge erred in finding that the factors that made the defendant's confession involuntary remained operative when he spoke to the pastor.  On this largely factual question, we owe the second motion judge substantial deference.  See, e.g., Commonwealth v. Morales, 461 Mass. 765, 766-767, 777-778 (2012); Commonwealth v. LeBeau, 451 Mass. 244, 254 (2008); Commonwealth v. Lujan, 93 Mass. App. Ct. 95, 100 (2018).
            The first motion judge found that "the defendant's will was gradually overborne by the length of interrogation, the manner of the interrogation, the use of disfavored investigative techniques and the defendant's cognitive limitations."  The defendant was "visibly fatigued and muttering to himself that he needed to go home and take his medication" and had resigned himself to returning to the police station that next day at their direction.  The second motion judge found, at the time that the defendant made his statements to the pastor, that "he remained 'disturbed,' 'distressed,' 'desperate,' and 'frustrated' by what he understood were the implications of his earlier statements to the police."  Although the Commonwealth questions whether the defendant's will truly was overborne to the extent described by the two motion judges, the record, if anything, shows that the defendant was extremely fatigued and appeared to accept the troopers' assertions as truth out of resignation.
            We have viewed the video recording and have seen for ourselves the extent of the defendant's fatigue.  In light of the video recording, the second motion judge was well warranted in believing that such extreme fatigue and resignation were likely to linger for several hours (and probably until the defendant got some sleep).  The judge, therefore, reasonably concluded that the fatigue and emotional resignation exploited by the police to coerce the defendant into confessing remained at the time he spoke to the pastor.  See Beecher II, 408 U.S. at 235, 236-237 (defendant still under effects of morphine);  Swanigan, 279 Kan. at 44 (no break in stream of events in light of defendant "with an [intelligence quotient] of 76 who is also susceptible to being overborne by anxiety").  Contrast Prater, 420 Mass. at 582-583 (defendant no longer intoxicated); Pileeki, 62 Mass. App. Ct. at 509 (same).  As he had been a few hours earlier, the defendant remained resigned to returning to the control of the police officers who had coerced his confession and, indeed, expressed his (correct) expectation that he would be arrested shortly.  See State v. Cullison, 227 N.W.2d 121, 130 (Iowa 1975) ("statement itself carries some indication of state of [defendant's] mind when it was taken").  The defendant repeated to the pastor, more or less, what he had said to the police officers while under their direct coercion at the police station.  See Collazo v. Estelle, 940 F.2d 411, 422 (9th Cir. 1991) (en banc), cert. denied, 502 U.S. 1031 (1992) (no dissipation of coercion where second questioner directly invoked prior, involuntary questioning).  In light of the video recording evidence, we discern no error in the second motion judge's findings.  See Commonwealth v. DiGiambattista, 83 Mass. App. Ct. 180, 182, 188-189 (2013) (reversing finding of involuntariness based on review of video recording of interrogation); Pileeki, supra (reviewing video recording to determine whether involuntary circumstances had receded).
            Of course, what makes this case so unusual is that the subsequent statement was given to the defendant's pastor, not to law enforcement.  Although that is a very important fact, there is no hard and fast rule that makes it decisive.  In Meehan, 377 Mass. at 569, the court found no break in the stream of events where the subsequent confession was to the defendant's mother.  In State v. Allies, 190 Mont. 475, 490 (1980), the Montana Supreme Court affirmed the suppression of a subsequent confession even though it was given to the defendant's girlfriend in a different location, where the defendant's mental illness "rendered him vulnerable to succumbing to the demands of others."  Cf. Grant v. Wainwright, 496 F.2d 1043, 1049 (5th Cir. 1974) (no break in stream of events where defendant's subsequent confession was to State psychiatrist after confession coerced by police officers); State v. Austin, 91 N.M. 586, 589 (Ct. App. 1978) (no break in stream of events between coerced confession to private investigator and subsequent confession to police officers); State v. Mendacino, 288 Or. 231, 238 (1979) (en banc) (no break in stream of events where defendant's subsequent confession was to State psychiatrist after confession coerced by police officers).  Contrast Matter of R.P.S., 191 Mont. 275, 282 (1981) (break in stream of events where defendant's subsequent confession was to friend thirty-three days after arguably coerced confession).  Depending on the nature of the coercion used, a defendant may remain under that coercion when later talking to friends or even family.  The mere fact that the second confession was to his pastor, therefore, does not require the conclusion that there was a break in the streams of events.  In light of the substantial evidence of the defendant's extreme fatigue and resignation at the end of the police interrogation, this fact does not mandate reversal of the second motion judge's conclusion.
            5.  Conclusion.  The order of the Superior Court judge granting the defendant's motion to suppress his statements to his pastor is affirmed.
 
footnotes

 
So ordered.
            [1] Her sweater was up over her chest, her pants were off, and her underwear was pulled below her buttocks.  Semen was discovered in her underwear.  This semen is not a deoxyribonucleic acid match to the defendant, but the Commonwealth argues that it is unlikely that the semen was deposited at the time of the crime.
            [2] The police had been told that MacLean had made unwanted advances toward the victim.  MacLean had died in an automobile accident well before the interview.
            [3] Up to this point, the troopers had not mentioned the rock as the murder weapon.
            [4] The trooper admitted that, at the first suppression hearing, he had testified that the trip took thirty to thirty-five minutes.
            [5] The Commonwealth properly accepts that, because it did not appeal the first suppression order, it cannot admit at trial the portion of the police interview suppressed in that order, even if we were to conclude that those statements were voluntary.
            [6] Although the defendant suggests that the Commonwealth must prove both to overcome the presumption, the Supreme Judicial Court's most recent pronouncements explain that the Commonwealth may overcome the presumption by proving either a break in the stream or that the cat remained in the bag.  Indeed, in Commonwealth v. Thomas, 469 Mass. 531, 551-552 (2014), the court found no break in the stream of events yet found the presumption was overcome because the cat was not out of the bag.  We acknowledge that earlier cases are not so specific.  Compare Commonwealth v. Prater, 420 Mass. 569, 580 n.10, 582-584 (1995) (determining there was break in stream and analyzing whether cat remained in bag), with Commonwealth v. Osachuk, 418 Mass. 229, 235-237 (1994) (finding no break in stream but going on to determine whether cat remaining in bag would eliminate taint).
            [7] The phrase has also appeared in dissents, see United States v. Henry, 447 U.S. 264, 288 (1980) (Blackmun, J., dissenting); Darwin, 391 U.S. at 351 (Harland, J., concurring in part and dissenting in part), in a discussion of the scope of the privilege against self-incrimination in responding to a subpoena, see Maness v. Meyers, 419 U.S. 449, 463 (1975), and in a single justice stay decision unrelated to confessions, Doe v. Gonzales, 546 U.S. 1301, 1308 (2005) (Ginsburg, J., in chambers).
            [8] We did the same in Commonwealth v. Pileeki, 62 Mass. App. Ct. 505, 508-510 (2004).
            [9] The difference, however, may not be of much practical import.  Although noninculpatory statements are frequently elicited in violation of Miranda rights, coerced confessions are usually inculpatory.